## Case No. 17,845.

### WILSON v. TURNER et al.

[Taney, 278; 7 Law Rep. 527; 1 Fish. Pat. Rep. 28.] [1]

Circuit Court, D. Maryland. April Term, 1845. [2]

PATENT FOR INVENTION — RENEWAL AND EXTENSION — RIGHTS OF ASSIGNEE — CONSTRUCTION OF ASSIGNMENT.

1. On the 27th of December, 1828, W. of the state of New York, obtained a patent for a machine of which he was the inventor, giving him the exclusive right to use the invention for fourteen years from the date of the patent, and no longer; on the 28th of November, 1829, in consideration of the assignment to him of a rival patent, W. assigned to T. H. & T., and their assigns, all his right in said patent, for certain places, amongst others, for all the state of Maryland except the part west of the Blue Ridge, "for the term of fourteen years from the date of the patent;" and by the deed of assignment, it was agreed, "that any improvement in either of the patents mutually assigned, in the machinery, or any alteration or renewal of the same, shall accrue to the benefit of the respective parties in interest, and may be applied and used within their respective districts as therein designated:" W., the patentee, afterwards died, and on the 16th of November, 1842, his administrator obtained a renewal and extension of the patent, under the act of July 4, 1836 [5 Stat. 117], for the term of seven years from the expiration of the original patent, and on the 9th of August, 1843, assigned to J. G. W. his interest in the patent so renewed, for all the state of Maryland east of the Blue Ridge. On a bill filed by J. G. W. against the assignee of T. H. & T., claiming the exclusive right to use said machine, within said limits, during the term for which the patent was renewed: held, that the act of July 4, 1836, applied to patents granted before its passage, as well as to those afterwards issued, and consequently, embraced the patent in question.

2. This law clearly intended that the assignees or grantees of the patentee should share in the benefit conferred on the patentee, and have some advantage from the extension of the patent for seven years; for it provides, in express terms, that the benefit of the renewal shall extend to them.

[Cited in Wilson v. Rousseau, 4 How. (45 U. S.) 694.]

3. The object of this clause in the act is, to preserve the contract, in the sense in which both parties understood and intended it, at the time it was made, and to secure to the purchaser the right which he intended to buy, and which the patentee must have intended to sell.

4. The legislature intended to guard the party who had purchased from the patentee, the right to use his invention until the expiration of his exclusive privilege, from the necessity of purchasing it again; and when they were giving the patentee a new privilege, and one which he had no legal right to demand, they had a right to annex to it such conditions and limitations as, in their judgment, justice required.

5. The law meant to provide that assignees and grantees should share with the patentee the benefit of the renewal, according to the interests which they respectively acquired in the thing patented, within particular districts of country, for their own individual use.

6. Under the covenant contained in the deed of the 28th November, 1829, each assignee, in his respective district, was to have precisely the same rights and benefits as the patentee himself had, or might afterwards obtain, so far as concerned these inventions; and if by a subsequent act of congress, advantages were given to the patentee which he did not at that time possess, and which were not, therefore, in the contemplation of the parties, yet, according to the spirit and meaning of the covenant, the assignee had a right to stand in the place of the patentee, in his district, in respect to the new privilege as well as the old; and it would be against equity and conscience, to allow him to use a privilege afterwards unexpectedly gained, in order to defeat his own contract, in a manner obviously inconsistent with the intention of the parties.

[Disapproved in Wetherill v. Passaic Zinc Co., Case No. 17,465.]

7. A case of this description is not one in which a court of equity is bound to lend its aid, even if the party had a right at law upon the technical construction of the covenant; but the word "renewal" is broad enough to embrace not only renewals then authorized by law, but renewals that might afterwards be provided for, and this construction of the word conforms in every respect to the scope and spirit of the agreement, and carries into effect the evident intention and design of the parties, at the time they made it, and is the only construction which will do equal justice to both.

In equity.

On the 31st of August, 1844, James G. Wilson, a citizen of the state of New York, filed his bill in this court, stating that on the 27th of December, 1828, William Woodworth, of the state of New York, obtained a patent for a new and useful improvement in the method of planing, tongueing, grooving and cutting into mouldings, either plank, boards or any other materials, and for reducing the same to an equal width and thickness; and also, for facing and dressing brick, and cutting, moulding or facing metallic, mineral or other substances. That said Woodworth was the true inventor and discoverer of said machine, and that it had not been in use, or described in any public work, anterior to the invention and discovery thereof by said patentee. That afterwards, Woodworth died, and on the petition of his administrator, William W. Woodworth, there was granted, on the 16th of November, 1842, an extension of said patent, for the term of seven years from the 27th of December, 1842, the date of the expiration of the first term. That afterwards, on the 2d day of January, 1843, the said William W. Woodworth executed an instrument of disclaimer to a part of the said patented improvement, according to the act of congress in such case made and provided. That on the 9th day of August, 1843, the complainant purchased from the said William W. Woodworth, administrator, all his interest in said letters patent, so renewed and extended, with the benefit of said disclaimer, for the state of Maryland east of the Blue Ridge. That being thus the assignee of all the rights existing under the said letters patent, and the extension there-

---

[1] [Reported by James Mason Campbell, Esq., and here reprinted by permission. 7 Law Rep. 527, contains only a partial report.]

[2] [Affirmed in 4 How. (45 U. S.) 712.]

of, in and for the state of Maryland, he had reason to believe that he would be permitted to enjoy the same, and the profits thereof, without let or hindrance; but that a certain Joseph Turner, Jr., and John C. Turner had had in operation, without any right or title thereto, ever since the date of said purchase, a machine substantially the same, in principle and mode of operation, with the machine for which letters patent were granted as aforesaid. That he had given notice to the said Turners, more than once, that such conduct was in violation of his, the complainant's, rights, and if persisted in, application would have to be made to this court for redress; of all which the said Turners had been utterly regardless. That from the time of the original patent, the machine had been known and recognized as the invention of William Woodworth aforesaid, and the right thereto, if ever questioned at all, had in the end always been admitted and yielded to. That at the term of the circuit court of the United States for the First district, commencing on the 16th of May last past, the case of Washburn & Brown v. Gould was tried, which was an action brought to recover damages on account of an alleged infringement of said extended letters patent, and after an able and protracted defence, a verdict was rendered for tne plaintiffs. Whereupon the complainant alleged that said patent had not only been sustained by long public concession, but also by the verdict of a jury and the judgment of a court, upon an ample trial upon the merits, and he, therefore, respectfully suggested that he had brought himself within the scope of the action of this court, by way of injunction, to protect his rights. The bill concluded with a prayer for an account and an injunction.

On the 19th of November, 1844, John C. Turner filed his separate answer, stating that a patent subsequent in date to Woodworth's was granted to Uri Emmons, for a new and useful improvement in the mode of planing floor-plank, and grooving, tongueing and straightening the edges of the same, planing boards, planing and straightening square timber, &c., by machinery, at one operation, called the cylindrical planing-machine; and that, by sundry assignments, the interest in the two patents of Woodworth and Emmons, for all the state of Maryland, except that part lying west of the Blue Ridge, became vested in the respondent and his co-defendant, with the right to receive the benefit, within said limits, of any improvement in the machinery, or alteration or renewal of the patent. That by virtue thereof, at the time of the supposed renewal of the patent granted to William Woodworth, the interest therein for the state of Maryland, except that part of said state lying west of the Blue Ridge, was vested in the respondent and his co-defendant, jointly with John Walsh and Samuel House, to

whom, to that extent, said renewal, if valid at all, accrued by force of an agreement in one of the deeds of assignment, through which the defendants trace their title, dated the 28th November, 1829; and at the time of the expiration of the said patent, on the 27th of December, 1842, the said right, by assignment to them of the interest of said Walsh and House, was vested wholly in the respondent and his co-defendant. That, he knew nothing of the supposed purchase alleged in the bill to have been made by the complainant of the said William W. Woodworth, but he denied that the said William W. Woodworth had any right to convey to the complainant the rights and privileges which he claimed to derive from that purchase. That the respondent and his co-defendant were the proprietors of a machine which they employed in the business of planing, and that it was erected at a very great expense, and a very large capital was employed in carrying on the business connected therewith. That the said machine was erected before the expiration of the original patents granted to Woodworth and Emmons, by those who were possessed of the privileges conferred by both those patents for all the state of Maryland except that part lying west of the Blue Ridge. That this respondent and his co-defendant had invested their capital in the said machine and in the said business, upon the faith of the several assignments aforesaid, and believing that they would be entitled to carry on the said business and use the said machine, either, in case the said patents expired, with the public at large, or, if either or both of them were renewed, by virtue of the agreement contained in one of the said deeds, that all renewals of either of them should accrue to the benefit of the parties in interest; and he asserted that they were entitled to do so, even if the machine which they employed were substantially the same, in principle and mode of operation, with the machine for which letters patent were granted to the said Woodworth as aforesaid, which he denied. That he knew nothing about the disclaimer of a part of the invention of William Woodworth made by William W. Woodworth, or of the trial in the district court of Massachusetts. That he believed the patent-right above recited as granted to Uri Emmons, was identical in principle and in mode of operation with the machine now used by the respondent and his co-defendant. And further, that the patent granted to said Woodworth was in part for facing and dressing brick, and cutting mouldings on or facing metallic, mineral or other substances; and he believed that said method was not capable of being applied to metallic or mineral substances, or to any other substance than wood, and that he was advised that said patent is therefore void.

Subsequently to the filing of this answer,

the parties filed in the cause the following agreement: [3] It is agreed that this cause be set down for final hearing. and submitted upon bill and answer, and the following statement of facts, which it is agreed shall be taken and received as though the same had been regularly proved under a commission issued and returned in the cause, either party to have the right to appeal to the supreme court, from such decision as the circuit court may see fit to make.

Statement of facts: It is admitted that, on the 27th December, 1828, William Woodworth obtained letters patent of the United States, for a new and useful improvement in the method of planing, tongueing, grooving and cutting into mouldings, either plank, boards or any other materials, and for reducing the same to an equal width or thickness; and also for facing and dressing brick, and cutting mouldings on, or facing metallic, mineral or other substances. That subsequently, the said William Woodworth died in the city of New York, when letters of administration upon his estate were granted by the surrogate of the county of New York, unto William W. Woodworth, a son of the deceased. That subsequently, the said administrator applied to the commissioner of patents for an extension of the said letters patent, when, on the 16th November, 1842, the board to whom, under the statute in such case made and provided, the said application was referred, did adjudge and certify in writing that the letters patent aforesaid should be extended; whereupon the commissioner of patents did renew and extend the said patent for the term of seven years, from and after the expiration of the term of fourteen years, for which the said patent was originally granted. That subsequently, on the 2d January, 1843, the said William W. Woodworth. administrator, did make disclaimer of all that part of the claim which is mentioned in said letters patent, which relates to the use of the circular saws, for reducing floor-plank and other materials to a width. That subsequently, the said William W. Woodworth, administrator as aforesaid, on the 9th August, 1843, did convey to the plaintiff, James G. Wilson, all his right, title and interest in and to the said patent-right and renewal, in and for the state of Maryland (except the western part thereof, which lies west of the Blue Ridge), and no other place whatever.

It is admitted further, for the purpose of the present suit, that at the time of the filing of the bill of this cause. the defendants were using, in their planing mill, in the city of Baltimore, a machine or machines which were substantially the same, in principle and mode of operation, with that described in the specification attached to the letters

patent aforesaid, without the license of the said plaintiff, or the said administrator, or any grantee or grantees under them, or either of them.

It is admitted that, on the 4th December, 1828, William Woodworth, the inventor, sold and conveyed half of his interest in the said invention to James Strong. That on the 25th April, 1829, one Uri Emmons obtained a patent for a new and useful improvement in the mode of planing floor-plank, and grooving and tongueing and straightening the edge of the same, planing boards, straightening and planing square timber, &c., by machinery, at one operation, called the cylindrical planing-machine. That afterwards, on the 16th May, 1829, the said Emmons sold his entire interest, in the last mentioned patent, to Daniel H. Toogood, Daniel Halstead and William Tyack. That afterwards, on the 28th November, 1829, the following mutual deed of assignment was executed between Woodworth and Strong, on the one part, and Toogood, Halstead, Tyack and Emmons on the other part, by which Woodworth and Strong conveyed to Toogood, Halstead and Tyack, all their interest in the patent of December 27th, 1828, in the following places, namely, in the city and county of Albany, in the state of New York; in the state of Maryland (except the western part, which lies west of the Blue Ridge); in Tennessee, Alabama, South Carolina, Georgia, the Floridas, Louisiana, Missouri and the territory west of the Mississippi; and Toogood, Halstead, Tyack and Emmons conveyed to Strong and Woodworth all their interest in Emmons' patent of 25th April, 1829, for the rest and residue of the United States; by which mutual deed of assignment the parties agreed that any improvement in the machinery, or alteration or renewal of either patent, such improvement, alteration or renewal should enure to the benefit of the respective parties in interest. and might be applied and used within their respective districts. That subsequently, on the 28th December, 1829, Tyack conveyed all his interest in the two patents to William Henry Culver. That subsequently, Toogood disposed of his entire interest in the two patents to Halstead. That subsequently, on the 15th October, 1830, Halstead assigned all his interest to William H. Culver, in whom all the interest conveyed by Woodworth & Strong under the joint deed became centred. That subsequently, on the 4th May, 1831, Culver assigned all his interest within the state of Maryland, except that part thereof lying west of the Blue Ridge, to Samuel T. Bladford. That subsequently, on the 6th September, 1831, Bladford sold his interest to Richard G. Howland. That subsequently, Howland, by deeds dated on the 7th September and 3d October, respectively, conveyed to Zachariah Woollen an equal interest with himself in the two patents within the limits last aforesaid. That subsequently, on the 1st April, 1836, Howland &

---

[3] The papers referred to as part of this agreement are omitted. as they are too lengthy to be inserted, and their substance sufficiently appears.

Woollen assigned all their interest to Joseph Turner, Jr., one of the defendants, John Walsh and Samuel House. That subsequently, on the said 1st April, 1836, Turner, Walsh and House conveyed two-fifths of their interest to Richard S. Howland. That subsequently, on the 1st August, 1836, Howland conveyed one-half of the two-fifths held by him to Edwin P. Starr. That subsequently, Starr and Howland, on the 7th April, 1838, assigned their interest to the said Turner, Walsh and House. That subsequently, by two assignments, dated on the 31st December, 1839, and 10th December, 1842, respectively, Walsh and House conveyed their interest to the two defendants, Joseph Turner, Jr., and John C. Turner.

It is further admitted, for the purposes of this suit, that at a trial which took place at May term, 1846, in the circuit court of the United States for the district of Massachusetts, in the case of Washburn and others v. Gould, the originality of the invention by Woodworth, the patentee, became a question, and was decided in favor of the patentee.

Reverdy Johnson and John W. B. Latrobe, for plaintiff.

Wm. Schley and Hugh Davey Evans, for defendants.

Before TANEY, Circuit Justice, and HEATH, District Judge.

TANEY, Circuit Justice. This case comes before the court upon a bill filed by James G. Wilson, against Joseph C. Turner, Jr., and John C. Turner, to restrain them from using a certain machine for planing planks and boards and other materials, which the said Turners have erected and are using in the city of Baltimore. John C. Turner, one of the defendants, has answered, and the material facts of the case as they appear upon the bill, answer and exhibits, so far as they affect this controversy, are as follows:

On the 27th of December, 1828, William Woodworth, of the state of New York, obtained a patent for the machine in question, of which, as the case now stands, he appears to have been the inventor, and according to the laws of congress then in force, this patent gave him and his assignees and grantees the exclusive right to use this invention for fourteen years from the date of his patent, and no longer; consequently, his monopoly would expire on the 27th day of December, 1842.

On the 28th of November, 1829, Woodworth, the patentee, and James Strong (who had, by purchase from the patentee, become entitled to one-half of the interest in the patent), in consideration of the assignment to him of a rival patent, assigned to Toogood, Halstead and Tyack, and their assigns, all their right and interest in the patent, to be sold and used in the following places: "namely, in the county of Albany, in the state of New York; in the state of Mary-land (except the western part thereof, which lies west of the Blue Ridge); in Tennessee, Mississippi, Alabama, South Carolina, Georgia, the Floridas, Louisiana, Missouri and the territories west of the Mississippi, and not in any other state or place within the limits of the United States, or the territories thereof; to have and to hold the rights and privileges thereby granted, to them and their assigns for and during the term of fourteen years from the date of the patent:" as more fully appears by reference to the deed of assignment filed in the case. The respondents claim the right to construct and use the machine in question, by title derived from these assignees.

Woodworth, the patentee, died some time before the 9th of February, 1839; on which day, letters of administration on his estate were granted, to William W. Woodworth; and on the 16th of November, 1842, the administrator obtained from the board of commissioners established by the act of congress of 4th July, 1836, the renewal and extension of the patent, for the term of seven years from and after the expiration of the first term of fourteen years; and on the 9th of August, 1843, Woodworth the administrator assigned to James G. Wilson the complainant, all his right, title and interest, in and to the said letters patent renewed and extended as aforesaid, for the state of Maryland, east of the Blue Ridge; and under this assignment, he claims the exclusive right to the use of this machine, in the part of this state above mentioned, from the date of the assignment, until the expiration of the extended term of seven years; and he insists that Toogood, Halstead and Tyack, and those claiming under them, have no right in the patent, by virtue of the assignment of 28th November, 1829, at the expiration of the original term of fourteen years; and that the continued use of it by the respondents is an infringement of his right. It is upon this ground that he asks for the injunction.

At the time this patent was originally granted to Woodworth, and at the time of the assignment to Toogood, Halstead and Tyack, and the subsequent assignments, until one of the defendants became interested in the patent as assignee, there was no law authorizing, under any circumstances, the extension of a patent beyond fourteen years. At the expiration of that period of time, the exclusive rights of the patentee, and his assignees and grantees, terminated, and every person had the right to use the invention without any consent or license from the inventor. But by the act of July 4, 1836 (section 18), the patentee of an invention or discovery was authorized to obtain a renewal and extension of the patent for seven years, after the expiration of the term of fourteen years, upon proving, to the satisfaction of the board of commissioners, established by that act, that he had failed to obtain from the use and sale of his invention, a reasonable

remuneration for the time, ingenuity and expense bestowed upon it, and the introduction thereof into use; and that thereupon the said patent should have the same effect in law, as though it had been originally granted for the term of twenty-one years; and the same act provides, that the benefit of such renewal shall extend to the assignees and grantees of the right to use the thing patented, to the extent of their respective interests therein. This power of extension applied to patents granted before the passage of the act, as well as to those which should be afterwards issued, and consequently, embraced the patent in question.

The dispute now before us arises upon the construction of the provision in favor of assignees and grantees. It is contended, on the part of the complainant, that this provision embraces only the rights which had been acquired in the original term of fourteen years, and that assignees and grantees of the original patent can claim no benefit, from their contracts, in the extended term of seven years; that the latter enures altogether to the benefit of the patentee; gives him the exclusive right to vend, assign and use the invention during that period; and authorizes him to prevent the use of it by those who had purchased the privilege for themselves immediately, or for particular districts of country, for the original time. If this be the construction of the act of congress, the provision in favor of assignees and grantees would seem to the court to be useless and nugatory. No one would suppose that the grant of this new right annulled all contracts made under the old one, and that giving to the patentee an additional term of seven years, would deprive purchasers of the rights which they had acquired in the original term, before the renewal was granted. If the patentee had assigned all his right, in a particular district or state, for and during the whole fourteen years, or even for a shorter period, surely that contract would continue binding upon him, notwithstanding he afterwards procured an extension of his patent, and congress could hardly have deemed it necessary to make a special provision for its protection. Certainly, according to this construction, assignees or grantees would derive no advantage from the renewal; yet the law clearly intended that they should share in the benefit conferred on the patentee, and have some advantage from the extension of the patent for seven years; for it provides, in express terms, that the benefit of the renewal shall extend to them, thus using a word which shows that it was not the intent of the legislature merely to protect interests which previously existed in assignees and grantees, but to give them a share in the benefit conferred on the patentee by the renewal of the patent.

Moreover, assignees who had purchased the title of the patentee, in particular states and territories, and individuals who had paid for the right to use the invention during the original period of the monopoly, might have suffered serious injustice by the grant of a new and further term to the patentee, unless they were embraced in it; and they would, therefore, very naturally and properly be the objects of protection. For in cases like the present, where the patent was issued, and the purchaser obtained his assignment, before the passage of the act of 1836, both parties must have understood that the exclusive right of the patentee for its whole period was transferred; and that at the expiration of the fourteen years, the assignee would have the right to use the invention without interruption, and without paying the inventor any further compensation.

The object of the clause in question is to preserve the contract, in the sense in which both parties understood and intended it, at the time it was made, and to secure to the purchaser the right which he intended to buy, and supposed he had bought, and which the patentee must have intended to sell, and at the time of the contract, must have supposed he had sold. Indeed, the power of extension given by the act of 1836 would have operated most unjustly upon those who had purchased the right to use a patented machine, if it had not been accompanied by a provision for their protection; for, relying on the assurance given by the law, as it stood when the contract was made, that they had purchased for the whole period of the monopoly, and that they might lawfully continue the use of the invention after the expiration of the fourteen years, many grantees, after having obtained the assignment or grant from the patentee, had undoubtedly erected costly machinery, and encountered expenses, which they would not have incurred, if they had supposed it would be in the power of the patentee to forbid the use of his invention, after the time limited by his original patent; and, if with these expenses incurred and arrangements made for the continued use of the improvement, congress had passed the law of 1836, without this provision in favor of assignees and grantees, it would have enabled the patentee to deal with them most severely and oppressively, and to exact from them a far heavier sum for the extended term of seven years, than they would have been willing, under other circumstances, to have given for the original term of fourteen.

The legislature obviously, we think, intended to guard the party who had purchased from the patentee the right to use his invention until the expiration of his exclusive privilege, from the necessity of buying it again. And when they were giving the patentee a new privilege, and one which he had no legal right to demand, they had undoubtedly a right to annex to it such conditions and limitation as, in their judgment, justice required.

The construction which we put upon the law is conformable also to the previous legislation of congress upon a similar subject; for

in the act passed the 21st January, 1808, entitled "An act for the relief of Oliver Evans" (6 Stat. 70), whereby, in consideration of the particular circumstances of the case, a new patent was granted to him, after the expiration of the original one, there is an express provision, that no person who had before paid him for a license to use his improvements, should be obliged to renew it, or be subject to damages for not renewing it; thus granting the new patent upon the same principles, with reference to purchasers, that has been adopted and followed in the act of 1836, in cases of the extension of the term.

It is true, as was urged in the argument, that the right of extension is obviously given by the law, chiefly with a view to the advantage of the inventor, and not of his assignees or grantees; and that the patent, if extended at all, must be extended on the application of the inventor, and not his assignees; and the reason of this distinction is evident. The assignee purchases because he supposes the improvement is worth the money he pays for it, and that he can make a profit by his bargain; and if it afterwards turns out that he was mistaken, and his speculation in the patent-right proves to be a losing one, there would be no more justice in giving him a new privilege, whereby the public would be compelled to make good his losses, than there would be in the case of any other speculation, which proved to be unfortunate. But the same reason which would operate to prevent an extension to the assignee, would apply with equal force between the patentee and assignee, where the right to extend was conferred on the former. For he assigns his right to the exclusive privilege in a particular district of country, or grants it to a particular individual for his own use, for a price which he deems adequate, and is willing to take; and it would hardly be just, if the invention afterwards proved to be more valuable than he himself supposed it to be, to re-invest him on that account with the exclusive privilege for a new term, in such a manner as would enable him to compel those who had already bought, to buy again; the more especially, when the enhanced value is often produced by the industry and expenditures of the assignee or grantee, in bringing it into more public use and more general notice.

There is one evident distinction, however, between the patentee and assignee, so far as the public is concerned. If the invention is a valuable one, the inventor confers a benefit upon the public, and yet, without any fault of his, he may fail to obtain a reasonable remuneration within the fourteen years, for the time, ingenuity and expense which he bestowed upon it; his title may be controverted, and a large portion of the time spent in expensive litigation; he may be unable to erect the improvements necessary to show its value and bring it into notice; he may have been unable to make sale of his privilege to others, upon terms which he was willing to take; and as between him and the public, therefore, which is to be ultimately benefited by the improvement, there is justice in the extension. It is to cases of this description that the act of congress applies. It proposes to do justice between the inventor and the public, while it protects assignees and grantees in the rights which they had previously acquired by contract with the patentee.

Besides, the words of the law appear to us to admit of no other interpretation than the one we have given. It declares that the benefit of the renewal shall extend to assignees and grantees of the thing patented, to the extent of their respective interests therein. Now, what benefit have they in the renewal, if they are excluded from the use of the thing patented during the whole of the renewed time? According to that construction of the law, so far from receiving a benefit, they would be subjected to loss. They would not even enjoy the right which they supposed they had bought, but would be compelled, at the expiration of the fourteen years, to stop the works they had constructed, at whatever loss it might occasion, unless the patentee gave them leave to proceed; yet the law, in plain terms, declares that they are to derive an advantage from the extension, and that the benefit of the renewal shall extend to them according to their respective interests. In other words, it means to provide, that assignees and grantees shall share with the patentee the benefit of the renewal, according to the interests which they had respectively acquired in the thing patented, within particular districts of country, or for their own individual use.

The construction we have given to this law, is not only called for by its language, but conforms to the principles established by congress, in a similar case, in the act of 1839. The seventh section of that act enables the inventor to obtain a patent, although he may have previously sold the right to use or vend it to different persons, provided the sale was not more than two years before his application for a patent, and provided further, that such invention had not been abandoned to the public. But the same section also provides, that the party who purchased prior to the application for a patent, may, notwithstanding the patent, continue to use the invention and vend it to others to be used, without incurring any liability to the inventor, or any other person interested in the invention. This privilege of the purchaser is without limitation as to time, and evidently would extend to a renewed or extended patent, as well as to the original term of fourteen years.

It was decided by the supreme court, in the case of McClurg v. Kingsland, 1 How. [42 U. S.] 202, that this right is not confined

to the particular machine actually constructed or manufactured before the application for the patent, but that the purchaser may continue to construct, manufacture and vend the machine or composition of matter, after the patent has been obtained. Now there can be no reason for denying to a purchaser, who makes his purchase after the patent, the privileges which the law obviously intended to secure to the party who made his purchase or obtained the license of the inventor before. If the rule is just in one case, it is just in the other; and if it be said that, in the last-mentioned case, the purchaser might not know that the inventor would ever apply for a patent, and had no reason to suppose that any obstacle would afterwards be interposed to the free and undisturbed use of the right he had purchased, the same must be said of the case now before the court: for the purchaser could not know that the inventor would ever apply for a renewed term; and when he purchased the right for the whole time of the existing monopoly, he had no reason to suppose that any new obstacle would afterwards be interposed, to prevent the free, undisturbed and continued use of that right. It would make the legislation of congress in these two laws inconsistent and contradictory in its principles, and, as we think, inconsistent with justice, in cases like the one before us, if we gave to the act of 1836 the construction contended for by the complainant.

. But if the law admitted of a different construction, yet the covenant of the inventor and his partner, contained in the deed of assignment hereinbefore mentioned, of 28th November, 1829, would, in the judgment of the court be an insuperable bar to the relief asked for by the bill; for it is expressly agreed between the parties to that instrument, that any improvement in either of the patents mutually assigned, in the machinery, or any alteration or renewal of the same, shall accrue to the benefit of the respective parties in interest, and may be applied and used within their respective districts, as therein designated. It is very true that, at the time this contract was made, the law authorizing the renewal in question had not passed, and the parties probably did not contemplate the passage of such a law. But whether the word "renewal" did or did not look to the extension of time given by the act of 1836, it is evident, upon the words of the covenant, that whatever additional value either inventor might afterwards be able to obtain for his invention, it should enure to the benefit of the assignee within the district assigned. The parties were not only bound forever afterwards to offer no obstruction to one another in their particular districts, but to give to each other the full benefit of their respective exertions to increase the value of these inventions; and if they then only looked to a renewal to be procured by surrendering the existing patent, if

it should be found to be defective, and taking out a new one, according to the act of July 3, 1832; yet it is very clear, that both parties intended that every benefit of every kind that might be obtained for the respective inventions, should belong to the assignees in their respective districts. They were, in that respect, to have a common interest in their inventions, and they have used the broadest words to accomplish that object; words which unquestionably embrace every mode by which the value of the patents could be increased.

Each assignee, in his respective district, was to have precisely the same rights and benefits as the patentee himself had, or might afterwards obtain, so far as concerns these inventions; and if, by a subsequent act of congress, advantages were given to the patentee, which he did not at that time possess, and which were not therefore in the contemplation of the parties, yet, according to the spirit and meaning of the covenant, the assignee had a right to stand in the place of the patentee, in his district, in respect to the new privilege as well as to the old; and it would be against equity and conscience to allow him to use a privilege, afterwards unexpectedly gained, in order to defeat his own contract, in a manner obviously inconsistent with the intention of the parties.

A case of this description is not one in which a court of equity is bound to lend its aid, even if the party had a right at law upon the technical construction of the covenant. But we think that the word "renewal" is broad enough to embrace not only renewals then authorized by law, but renewals that might afterwards be provided for; and that this construction of the word conforms in every respect to the scope and spirit of the agreement, and carries into effect the evident intention and design of the parties at the time they made it, and is the only construction which will do equal justice to both parties. Upon the whole, therefore, the court are of opinion that the complainant is not entitled to relief, and that his bill must be dismissed. Bill dismissed with costs.

Affirmed by the supreme court, in 4 How. [45 U. S.] 712.

[For other cases involving this patent, see note to Bicknell v. Todd, Case No. 1,389.]